# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**MARY G. NOYES,**                    Chapter 7
    Debtor                    Case No. 07-11278-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matters before the Court are the "Motion of TriBeCa Lending Corporation for

Relief from the Automatic Stay Pursuant to 11 U.S.C. Section 362 and the Co-Debtor Stay

of 11 U.S.C. Section 1301"(the "Motion for Relief"), filed on August 22, 2007, and (2) the

"Objection to Motion of TriBeCa Lending Corporation for Relief from the Automatic Stay"

(the "Objection"), filed by the Debtor, Mary G. Noyes (the "Debtor").  Through its Motion

for Relief, TriBeCa Lending Corporation ("Tribeca") seeks relief from the automatic stay

and the co-debtor stay pursuant to 11 U.S.C. §§ 362(d)(1), (d)(2) and 1301 to foreclose a

mortgage (the "Mortgage") it holds on real property located at 52 High Road, Newbury,

Massachusetts (the "Property") owned by the Debtor and her non-debtor son, Thomas V.

1

Noyes (individually, "Thomas" and collectively with the Debtor, the "Borrowers") as joint tenants. The Mortgage held by Tribeca secures an adjustable rate promissory note (the "Note"), dated December 22, 2005. The Note was in the original principal amount of $420,000, had an initial annual interest rate of 12.99%, and was executed by the Borrowers in connection with a refinancing of the Debtor's prior mortgages on the Property.

The Debtor opposes the Motion for Relief on the ground that she and Thomas have claims against Tribeca and its agents, including a mortgage broker, "for violations of M.G.L. c 93A [sic] for fraudulent and deceptive practices" in connection with the refinancing, which claims exceed amounts due under the Note. The Borrowers' claims are the subject of a pending state court action filed in the Essex County Superior Court, Department of the Trial Court (the "State Court Action").

The Court conducted a preliminary hearing on the Motion for Relief and the Objection on September 21, 2007. In light of the decision of the United States Court of Appeals for the First Circuit in Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26 (1st Cir. 1994)(hereinafter "Grella"), the Court instructed the Debtor to file a pleading, supported by evidence, to establish her likelihood of success on the merits on her claims in the State Court Action and granted Tribeca an opportunity to file a responsive pleading. The parties filed their respective pleadings by October 11, 2007. On October 22, 2007, following its review of the materials submitted, the Court found that good cause existed under 11 U.S.C. § 362(e)(1) and (e)(2) to continue the stay and scheduled a final evidentiary hearing for November 15, 2007 for the purpose of evaluating the Debtor's claims against Tribeca and

2

determining the Motion for Relief.

Three witnesses testified at trial: Lisa Eileen Roache ("Roache"), the Debtor's attorney in the State Court Action, Robert E. Kelley ("Kelley"), the closing attorney for Tribeca, and the Debtor. The parties introduced a total of 37 documents into evidence, consisting primarily of the executed loan documents delivered to Roache by Tribeca's counsel. The Debtor did not call the mortgage broker involved in the refinancing transaction, Steve Elliott ("Elliott"), or any representative of Universal Mortgage Group, LLC ("Universal"), the mortgage brokerage firm that employed Elliott, to testify, although both are defendants in the State Court Action.

The parties stipulated that the Borrowers executed and delivered the Note and Mortgage on December 22, 2005, that the Debtor made two prepetition payments totaling $10,105.10, and that the Debtor made one postpetition payment in the amount of $5,052.55 under the Note. At the outset of the trial, the Court found that there could be no dispute that "cause" existed under 11 U.S.C. § 362(d)(1)[1] for relief from stay because of the Debtor's failure to make the required monthly payments under the Note.

---

[1] The statute provides:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. § 362(d)(1).

The issue presented is whether Tribeca has sustained its burden of demonstrating that it has a legitimate claim to the Property. Stated conversely, the issue presented is whether the Debtor has sustained her burden of establishing a defense to Tribeca's claim, in effect, establishing entitlement to an injunction against the continuation of foreclosure proceedings by Tribeca, and, if so, whether this Court should deny Tribeca's Motion for Relief. The issue requires this Court to explore the nexus between alleged predatory lending practices of brokers and lenders and the desperation of debtors, such as Mary Noyes, who, given dire, and perhaps hopeless, financial situations, seemingly are willing to execute any loan documents put before them to avoid loss of their homes. This case highlights a number of issues and problems arising in cases where lenders, such as Tribeca in this case, make loans to borrowers without regard to their ability to pay: (1) the absence of a bright line between illegal or unconscionable conduct and conduct that may be merely immoral or unethical; (2) the relationship between brokers and lenders and the proof required to establish vicarious liability on the part of lenders for fraud or other misconduct on the part of brokers; (3) the complexity of consumer protections laws and the burdens they impose for obtaining meaningful remedies for distressed homeowners; and (4) the necessity of diligent lawyering on the part of debtors' counsel, for only through a thorough understanding of both bankruptcy and consumer protection laws can attorneys for distressed borrowers translate very sad stories into entitlement to legal or equitable relief. For the reasons set forth below, the Court finds that although she has raised serious questions about the conduct of Tribeca, Mary Noyes failed in her burden of establishing

4

entitlement to injunctive relief from this Court, although she may well prove some liability

and damages in the State Court Action after a full opportunity for discovery.

The Court now makes its findings of fact and conclusions of law in accordance with

Fed. R. Bankr. P. 7052.

## II. FACTS

A. Introduction

The Debtor is 82 years old and the widow of the late Edwin Noyes ("Edwin"). She

and her son, Thomas, who is in his late forties and in poor health, reside at the Property,

which has been the family residence for over sixty years. Edwin operated a trucking

business through a company known as E.T. Noyes, Jr., & Sons, Inc. (the "Company"). The

Debtor and Thomas continue to operate the business, but they have experienced and

continue to experience financial difficulties, particularly because of Thomas's ill-health.

Neither the Debtor nor Thomas are sophisticated in financial matters, although both have

high school educations.

B. Procedural History of the Debtor's Bankruptcy Case

The Debtor filed a voluntary Chapter 13 petition on March 5, 2007. On Schedule A-

Real Property, she listed the Property with a value of $532,200, subject to secured claims

in the sum of $419,806. On Schedule B-Personal Property, she did not list stock or interests

in incorporated or unincorporated businesses or her contingent and unliquidated claims

against Tribeca or any other entities. On Schedule E-Creditors Holding Unsecured Priority

Claims, she listed both the Massachusetts Department of Revenue and the Internal

Revenue Service as the holders of claims in unknown amounts. On Schedule F-Creditors

Holding Unsecured Nonpriority Claims, she listed claims totaling approximately $28,000.

In her Statement of Financial Affairs, she disclosed that her annual income was $219,780

in 2006 and $205,944 in 2005.

The Debtor originally proposed a 60-month plan through which she would make

monthly payments of $560 to satisfy the pre-petition arrearage of "Franklin Cm" in the sum

of $27,000, as well as a priority tax claim of the Town of Newbury in the sum of $3,150. She

proposed a 1% dividend to holders of unsecured claims, which she erroneously listed in

the amount of $7,705.

Numerous parties objected to the Debtor's plan. GMAC, the holder by assignment

of a "SmartLease Agreement," dated January 3, 2006,[2] was the first to object on the ground

that the Debtor, in her plan, failed to state whether she intended to assume or reject the

lease of a GMC Sierra truck.

The United States of America filed an objection in which it indicated that it had filed

a proof of claim comprised of an unsecured priority claim in the sum of $66,921.32 and a

general unsecured claim in the sum of $16,411.10. According to the United States, the

Debtor's plan failed to provide for its claim.

Franklin Credit Management Corp. ("Franklin Credit Management"), Tribeca's loan

servicer, also filed an objection in which it stated that its prepetition arrearage claim was

---

[2] The Lease required the Debtor to make payments totaling $19,017.36 in 36
monthly installments of $528.26, commencing on January 3, 2006.

$64,795.96, not $27,000. It subsequently withdrew its objection when it obtained successor counsel. On April 19, 2007, Tribeca filed an objection to confirmation on the grounds that the Debtor's plan significantly understated its arrearage and was not feasible. The Debtor objected to Franklin Credit Management's proof of claim, as well as that of the United States. She objected to the claim filed by Franklin Credit Management on the grounds that Tribeca failed to pay certain of her tax obligations and that it charged her for foreclosure fees and costs which were not reasonable or customary.

The United States responded to the Debtor's objection by observing that the Debtor was liable for outstanding federal income tax liabilities for 1999, 2004, 2005 and 2006 and that she had not filed, as of the petition date, income tax returns for the years 2004, 2005 and 2006.

On July 2, 2007, in response to the various objections, the Debtor 1) withdrew her objections to the claims filed by Franklin Credit Management [3] and the United States; 2) moved to amend Schedule I and her Chapter 13 plan;[4] and 3) filed an amended Chapter 13

---

[3] The Debtor recommended that "this Honorable Court allow the Proof of Claim filed by Franklin Credit Management Corporation aka [sic] Tribeca." Presumably, she intended the Court to allow the amended claim filed by Franklin Credit Management Corp. on April 23, 2007. That proof of claim sets forth a secured claim in the total sum of $479,900.28, and an arrearage of $67,568.74.

[4] On amended Schedule I-Current Income of Individual Debtor(s), the Debtor listed her occupation as "contractor," and her employer as the United States Postal Service. She listed her income from operation of her business at $5,467, adding to that sum social security income in the amount of $1,153, rental income from Thomas in the amount of $1,700, and income from contributions from her sons and daughters in the amount of $2,000, for total monthly income of $10,320.

plan.  As a result of the Debtor's decision to withdraw her objection to the proof of claim filed by Franklin Credit Management, Tribeca has an allowed claim in the Debtor's Chapter 13 case in the sum of $479,900.28.

In her amended, 60-month, Chapter 13 plan, the Debtor proposed a monthly plan payment of $2,549 to satisfy outstanding claims.  The Debtor accepted Tribeca's prepetition arrearage claim in the sum of $67,568.74, as set forth in its amended proof of claim, and provided for the priority claim of the IRS in the sum of $66,921.32.  In view of the magnitude of her secured and priority claims, the Debtor proposed a -0-% dividend to her unsecured creditors whose claims she listed in the total sum of $44,116.10 in her plan.  The Debtor did not address the proof of claim filed by the Massachusetts Department of Revenue.[5]  The Court has not confirmed the Debtor's amended plan.

On August 22, 2007, Tribeca filed its Motion for Relief, explaining that Franklin Credit Management was its agent.  It alleged that the Debtor and Thomas had made one postpetition payment in the sum of $5,052.55, which it applied to the postpetition payment due on April 1, 2007 and that the Debtor owed it a postpetition arrearage in the sum of $21,324.44 comprised of four monthly payments of $5,052.55 and four late charges of $139.28.  Tribeca also asserted that, as of August 22, 2007, the liquidation value of the Property was $360,000 and that the total amount of encumbrances on the Property was $512,925.46.

---

[5] In its claim, which it filed on June 18, 2007, the Massachusetts Department of Revenue set forth a secured claim in the sum of $14,671.26 and a priority claim in the sum of $13,695.44.

C. Factual Background and the Refinancing with Tribeca

Prior to the decision to refinance with Tribeca, the Property, which had been in the name of the Debtor and Edwin, was subject to mortgages held by Beneficial and Wells Fargo in the total amount of approximately $227,000. The Debtor failed to submit evidence as to when she and Edwin obtained the mortgages or evidence of their terms. During the hearing, however, Roache testified that the transaction with Tribeca was exempt from Mass. Gen. Laws. ch. 183, § 28C, which provides that "a lender shall not knowingly make a loan that pays off all or part of an existing home loan that was consummated within the prior sixty months unless the refinancing is in the borrower's interest." *See generally* Howard J. Alperin and Roland F. Chase, "Refinancing – The "borrower's interest standard," 35A Mass. Practice, Consumer Law § 15:44.5 (2d ed. 2007) (footnote omitted).[6] In addition, because the Debtor was unable to pay her income taxes, federal and state taxing authorities had recorded liens against the Property in the approximate sum of $157,000. Prior to filing her bankruptcy petition, the Debtor, with the assistance of her daughter, Mary Jane Oakes ("Mary Jane"), had engaged an attorney, Timothy Burke ("Attorney Burke"), to negotiate with the taxing authorities to reduce these claims.

Despite the Debtor's efforts to address her outstanding tax liabilities, in August, 2005, Wells Fargo accelerated its note and notified the Debtor that it had commenced a

---

[6] The refinancing was exempt either because the Wells Fargo and Beneficial mortgages were granted more than five years before the December 22, 2005 closing or because, as Roache seemed to suggest, the Beneficial loan was an open-ended, home-equity line of credit.

foreclosure proceeding. Mary Jane began to investigate a possible refinancing of the Property and engaged the services of Elliott, a mortgage broker with Universal. On December 22, 2005, the Debtor and Thomas, to whom his mother had transferred an interest in the Property as a joint tenant to facilitate the refinancing with Tribeca, executed the Note and Mortgage in favor of Tribeca.

Kelley conducted the loan closing at the Debtor's home on the evening of December 22, 2005, and he, the Borrowers, and Mary Jane were present. The first loan payment was due in February, 2006. Tribeca received the Debtor's first mortgage payment on or about February 6, 2006 in the amount of $4,642.76, a sum which did not include $409.79 for taxes and insurance. On March 2, 2006, the Borrowers made up the shortfall by paying Tribeca $409.79, but the loan was already in default for nonpayment. The Borrowers made a second monthly payment in March in the correct amount of $5,052.55, but thereafter ceased making payments. On July 28, 2006, Tribeca initiated foreclosure proceedings against the Property. The Debtor, with the help of Mary Jane and another daughter, Brenda, engaged Roache to assist her in stopping the foreclosure. On November 13, 2006, Roache wrote the first of two demand letters to Tribeca and its agents alleging unfair and deceptive practices under Mass. Gen. Laws ch. 93A and violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 (West 2002) ("RESPA") in connection with the December 22, 2005 refinancing and requesting copies of the executed refinancing documents which she alleged had never been delivered to the Borrowers after the closing.

The parties exchanged correspondence, and, on December 22, 2006, Tribeca's

counsel provided Roache with copies of the executed closing documents. On February 7, 2007, Tribeca's counsel offered Roache and the Borrowers $1,500 in settlement of their claims but otherwise denied any liability under Mass. Gen. Laws ch. 93A and/or RESPA. Tribeca informed Roache that it would resume its foreclosure proceedings, the circumstance which triggered the Debtor's decision to file a bankruptcy petition on March 5, 2007.

On or around August 17, 2007, just days before Tribeca filed its Motion for Relief, the Debtor and Thomas commenced the State Court Action in the Essex County Superior Court against Tribeca, Franklin Credit Management, Elliott, and Universal, a Massachusetts licensed mortgage broker, seeking damages and rescission of the Mortgage, as well as damages under Mass. Gen. Laws ch. 93A. Although the Debtor introduced 27 exhibits into evidence at the evidentiary hearing held on November 15, 2007, she failed to introduce a copy of her complaint in the State Court Action. Because the Borrowers' complaint is critical to an understanding of the Debtor's opposition to the Motion for Relief, this Court shall consider the complaint, particularly as Tribeca produced a copy of it for the Court's review at a preliminary hearing on its Motion for Relief held on September 20, 2007.

The Debtor and Thomas captioned their complaint against Tribeca, Franklin Credit Management, Universal, and Elliott, as a "Complaint for Injunctive and Declaratory Relief, Money Damages and Recission and Request for Jury Trial." Through their unverified complaint, the Borrowers set forth eight counts: Violation of the Massachusetts Mortgage

11

Broker Act; Breach of Fiduciary Duty and Undue Influence; Recission and Damages under

Massachusetts Consumer Protection Act; Injunctive Relief under the Massachusetts

Consumer Protection Act; Fraud; Breach of Contract; Emotional Distress; and Civil

Conspiracy.[7] Notably, the Borrowers did not set forth any specific causes of action under

---

[7] Specifically, in the "Wherefore" clauses, the Borrowers requested the following:

1. On the Noyes [sic] first cause of action for Violation of the Massachusetts Mortgage Broker Act, pursuant to M.G.L. c. 93A, award damages against Steve Elliott and Universal Mortgage Group, LLC, in an amount not less than that paid by the Noyes [sic], plus punitive damages.

2. On the Noyes second cause of action for Breach of Fiduciary Duty and Undue Influence against Steve Elliott and Universal Mortgage Group LLC, award actual, compensatory, and punitive damages in an amount to be proved at trial.

3. On the Noyes [sic] third cause of action for Recission and Damages under the Massachusetts Consumer Protection Act, declare the contract for mortgage broker services rescinded pursuant to M.G.L. c. 93A and order Steve Elliott and Universal Mortgage Group LLC to return to the Noyes [sic] their payment of $12,600 and for the amount of the unconscionable loan of $420,000 plus treble their consequential damages, against the Defendants, jointly and severally and enter a declaratory judgment that the mortgage loan is rescinded and any security interest void.

4. On the Noyes [sic] fourth cause of action for injunction under M.G.L. c. 93A, enjoin Tribeca Lending Corporation and Franklin Credit Management Corporation from continuing such unfair and deceptive acts and practices and prohibit their continued collection of fees through the bankruptcy court until this trial is concluded.

5. On Noyes [sic] fifth cause of action for Fraud, against all the Defendants, jointly and severally, award actual, compensatory and punitive damages in an amount to be proved at trial.

6. On Noyes [sic] sixth cause of action for Breach of Contract against the

the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692o (West 1998) ("FDCPA"); the

Truth in Lending Act, 15 U.S.C. §§ 1601-1667e (West 1998)("TILA"); or the Massachusetts

Consumer Credit Cost Disclosure Act, Mass. Gen. Laws Ann. ch. 140D, §§ 1-34 (West 1991

& Supp.2001)("MCCCDA").  Similarly, although the Borrowers referenced "RESPA" in

their complaint, and the Debtor referenced it in her brief, their counsel did not cite any

specific sections of RESPA or its implementing regulation, Regulation X, 24 C.F.R. § 3500

*et seq.*  Moreover, in their State Court Action, the Borrowers did not set forth a separate

claim for avoiding the Note and Mortgage based upon a theory of unconscionability

under Massachusetts law, and they did not assert that the provisions of the Massachusetts

Predatory Home Loan Practices Act, Mass. Gen. Laws ch. 183, §§ 1-19, applied to their

loan.[8]  They also did not assert that the Debtor lacked the capacity to enter into the

---

Defendants, award actual and compensatory damages in an amount to be
proven at trial.

7. On Noyes [sic] seventh cause of action for Emotional Distress against
the Defendants, jointly and severally, award actual, compensatory and
punitive damages in an amount to be proven at trial.

8. On Noyes [sic] eight cause of action for Civil Conspiracy against the
Defendants, jointly and severally, award actual, compensatory and
punitive damages in an amount to be proven at trial.


[8] Under the act, a "high cost home mortgage loan" is defined as

[A] consumer credit transaction that is secured by the borrower's principal
dwelling, other than a reverse mortgage transaction, a home mortgage
loan that meets 1 of the following conditions:--

(i) the annual percentage rate at consummation will exceed by more than 8 percentage points for first-lien loans, or by more than 9 percentage points for subordinate-lien loans, the yield on United States Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the lender; and when calculating the annual percentage rate for adjustable rate loans, the lender shall use the interest rate that would be effective once the introductory rate has expired.

(ii) Excluding either a conventional prepayment penalty or up to 2 bona fide discount points, the total points and fees exceed the greater of 5 per cent of the total loan amount or $400; the $400 figure shall be adjusted annually by the commissioner of banks on January 1 by the annual percentage change in the Consumer Price Index that was reported on the preceding June 1.

Mass. Gen. Laws ch. 183C, § 2.  Points and fees are defined as follows:

(i) items required to be disclosed pursuant to sections 226.4 (a) and 226.4 (b) of Title 12 of the Code of Federal Regulations or 209 CMR 32.04(1) and 209 CMR 32.04(2) of the Code of Massachusetts Regulations, as amended from time to time, except interest or the time-price differential; (ii) charges for items listed under sections 226.4 (c) (7) of Title 12 of the Code of Federal Regulations or 209 CMR 32.04(3)(g) of the Code of Massachusetts Regulations, as amended from time to time, but only if the lender receives direct or indirect compensation in connection with the charge, otherwise, the charges are not included within the meaning of the term "points and fees"; (iii) the maximum prepayment fees and penalties that may be charged or collected under the terms of the loan documents; (iv) all prepayment fees of penalties that are incurred by the borrower if the loan refinances a previous loan made or currently held by the same lender; (v) all compensation paid directly or indirectly to a mortgage broker, including a broker that originates a home loan in its own name in a table-funded transaction, not otherwise included in clauses (i) or (ii); (vi) the cost of all premiums financed by the creditor, directly or indirectly for any credit life, credit disability, credit unemployment or credit property

14

refinancing transaction.  Instead, in their complaint and in the brief filed by the Debtor,

attorneys for the Borrowers primarily relied upon the Massachusetts Consumer Protection

Act, Mass. Gen. Laws Ann. ch. 93A, §§ 1-11 (West 1997) ("ch. 93A"), and the Code of

Massachusetts Regulations, 940 Mass. Regs. Code § 8:00 *et seq,.*[9] asserting that violations

---

insurance, or any other life or health insurance, or any payments financed
by the creditor directly or indirectly for any debt cancellation or
suspension agreement or contract, except that insurance premiums or debt
cancellation or suspension fees calculated and paid on a monthly basis
shall not be considered financed by the creditor. Points and fees shall not
include the following: (1) taxes, filing fees, recording and other charges
and fees paid to or to be paid to a public official for determining the
existence of or for perfecting, releasing or satisfying a security interest;
and, (2) fees paid to a person other than a lender or to the mortgage
broker for the following: fees for flood certification; fees for pest
infestation; fees for flood determination; appraisal fees; fees for
inspections performed before closing; credit reports; surveys; notary fees;
escrow charges so long as not otherwise included under clause (i); title
insurance premiums; and fire insurance and flood insurance premiums, if
the conditions in sections 226.4 (d) (2) of Title 12 of the Code of Federal
Regulations or 209 CMR 32.04(4)(b) of the Code of Massachusetts
Regulations, as amended from time to time, are met. For open-end loans,
the points and fees shall be calculated by adding the total points and fees
known at or before closing, including the maximum prepayment penalties
that may be charged or collected under the terms of the loan documents,
plus the minimum additional fees the borrower would be required to pay
to draw down an amount equal to the total credit line.

Id. If a creditor makes a high-cost home mortgage loan without obtaining a certification
from a counselor with a third-party nonprofit organization approved by U.S.
Department of Housing and Urban Development or other regulatory agency that the
borrower has received counseling on the advisability of the loan transaction, the
mortgage loan is not enforceable. Id. at § 3.

[9] The Attorney General promulgated these regulations "to protect Massachusetts
consumers seeking residential mortgage loans for home improvements and other
purposes . . . and to ensure that the mortgage industry is operating fairly and honestly
by means of legitimate and responsible business acts and practices that are neither

of RESPA constitute a violation of ch. 93A.

The Debtor introduced two HUD-1 Settlement Statements, Exhibits H and I, only

one of which was signed by the Borrowers. The signed settlement statement, Exhibit I,

reflects the following disbursements from the loan proceeds:

| Settlement Charges | $ 22,287.55[10] |
|---|---|
| Harmon Law Offices (Wells Fargo) | $122,939.73 |
| Beneficial | $104,029.71 |
| Federal Tax Lien | $112,931.73 |
| Federal Tax Lien | $ 40,103.19 |
| Mass DOR State Tax Lien | $   1,043.70 |
| Mass DOR State Tax Lien | $   2,872.82 |
| Gross Amount Due from Borrower | $406,208.43 |
| Cash to Borrower | $ 13,791.57 |
| Total | $420,000.00 |

Roache testified at trial that four of the documents delivered to her by counsel to

Tribeca contained the forged signatures of the Debtor and Thomas[11] and that the Debtor

---

unfair nor deceptive." 940 Mass. Code Regs. 8.01.

[10] In addition to seemingly customary closing costs for inspections, appraisals and recording fees, this amount also included a "Loan Origination Fee" payable to Tribeca in the amount of $4,200 and a "Broker Fee" payable to Universal in the amount of $12,600.

[11] All of the lettered exhibits listed herein are references to exhibits introduced by the Debtor as the Defendant. All numbered exhibits are references to exhibits introduced by Tribeca as the Plaintiff.

did not receive or review various documents prior to the closing. All four of the exhibits, which the Debtor alleges were forged, were purportedly signed by the Debtor and Thomas on December 21, 2005, the day before the closing. The first exhibit, Exhibit A, the Statement of Borrower's Benefits is a disclosure statement required in some loan transactions by Mass. Gen. Laws ch. 183, § 28C, the "borrower's interest statute,"which exhibit contains an erroneous reference to the Borrowers' "New Jersey Home."[12] The second exhibit, Exhibit C, is a "Resource Letter" printed on Tribeca letterhead, which reflects that the Borrowers were approved for a loan of $420,000 under a "no income, no asset" ("NINA") program. In that letter, Tribeca stated the following:

> It is important that you confirm your ability to make the above described monthly payment [$5,052.55].    To assist you in making such a determination, we are advising you that had you applied for a loan under our standard loan program ( a program where we verify your income and assets), your annual income would need to be $139,000. If your annual income is projected to be lower than $138,750, you must have additional resources available to fund your monthly payments until you can reasonably be expected to meet the typical annual income requirement. For example, you may have
>
> 1) Savings or other investments;
>
> 2) Family members or friends who will make resources available to you;
>
> 3) Expectation of salary increases or other sources of income in the future;

---

[12] The Debtor testified that she does not own any property in New Jersey and has never been to New Jersey. Tr. at 184. Despite the factual error contained in the document, Roache, however, testified that the provisions of Mass. Gen. Laws ch. 183, § 28C do not apply to the Debtor's mortgage loan.

4) An expectation and/or willingness to sell your home.

The payment amounts and required annual income amount shown above may increase or decrease based on the interest rate you eventually lock in.

When considering your ability to make timely payments, be aware that you will also be required to pay various closing costs which may include attorney fees, title charges, points, broker fees, tax/insurance escrows, and other closing related items.

If you do not have sufficient income or other assets or resources such as those stated above, we advise you to consider borrowing a lower loan amount.

The third exhibit, Exhibit D, is a letter, dated November 5, 2005, which provided, in part: "To Whom it May Concern: . . . [T]he cash we receive from the refinance of our home will be used for. . . paying off debt and making some home improvements." The fourth allegedly forged document, Exhibit E, is a letter, dated November 5, 2005, which provided, in part: "To Whom it May Concern: . . . We were left with large debts after the death of Thomas Noyes (Mary's husband and Thomas' father). . . ." [13]

In addition to the documents Roache testified were forged, Roache pointed out that many of the other closing documents were incomplete, unsigned or contained material inconsistencies. For example, Exhibit B, the Good Faith Estimate of Settlement Charges which the Borrowers signed on December 21, 2005,[14] and which must be provided to certain borrowers pursuant RESPA, *see* 12 U.S.C. § 2604; 24 C.F.R. § 3500.7, listed a "Loan

---

[13] As noted above, the Debtor's husband's name was Edwin, not Thomas.

[14] The document contains the typed date of December 22, 2005. The execution date of December 21, 2005 is handwritten next to the signature lines.

Origination Fee" of 3% payable to the broker in the amount of $12,600;[15] a "Loan Origination Fee" of 1% payable to an unnamed party in the amount of $4,200; and existing liens of $226,773.94. The Good Faith Estimate did not contain any reference to the existing tax liens on the Property.

In addition to the documents identified above, the Debtor introduced the following loan closing documents into evidence which Roache received from Tribeca's counsel: (1) Exhibit F, Credit Scoring Information sheets, which did not contain the Borrowers' credit scores; (2) Exhibit G, a Consumer Credit Score Disclosure, which was not signed or dated by either of the Borrowers; (3) Exhibits H and I, two versions of the HUD-1 Settlement Statement, which contained different amounts with respect to items to be paid at closing;[16] (4) Exhibit J, a Mortgage Broker Disclosure form required by 940 Code Mass. Regs. § 8.05(1), dated October 30, 2005, which reflected that the broker's origination fee would be either $8,400 or zero;[17] (5) Exhibit K, a Wholesale Funding Fee Sheet, which reflected a total broker fee and origination fee of $8,400 and which was not executed by the broker; (6) Exhibit L, a Payment Letter to Borrower (the "First Payment Letter"), which provided that the first monthly mortgage payment was due on February 1, 2006 in the amount of $4,642.76; (7) Exhibit M, a "Monthly Mortgage Statement for 02/13/2006," printed on

---

[15] This charge exceeds the fee disclosed in Exhibit J as discussed below.

[16] Only Exhibit I was executed by the Borrowers.

[17] The $8,400 figure appears twice in the document but is crossed out once with a handwritten "slashed zero" through it such as "⊘." The broker fee the Borrowers actually paid was $12,600 along with a "Loan Origination Fee" of $4,200.

Franklin Credit Management letterhead, which reflected that it had received a payment

of $4,642.76 on February 8, 2006 and treated the payment as an "unapplied payment," that

a current payment of $5,052.55 was owed, and that the total amount due was $10,105.10;[18]

(8) Exhibits N and O, Monthly Mortgage Statements issued by Franklin Credit

Management for March and April, 2006, both of which reflected a monthly payment

amount of $5,052.55 which is a different amount than the amount set forth in the First

Payment Letter, *see* Exhibit L;[19] (9) Exhibit R, consisting of two Loan Servicing Disclosure

Statements, one of which reflected that Tribeca assigned, sold or transferred its mortgage

serving rights between 50% to 75% of the time during the years 2002 through 2004, and

other reflecting that it did so 100% of the time during those same years; (10) Exhibit S, an

invoice issued by Epic Appraisals, LLC to Universal on September 21, 2005 for its

appraisal of the Property, as well as the appraisal itself in which Vincent Nazzaro, the

appraiser, concluded that the Property was worth $652,424; (11) Exhibit T-1, a Uniform

---

[18] The "current payment" owed, as reflected on this statement, was $5,052.55 which included an escrow payment, for interest and taxes, of $409.79. The First Payment Letter issued to the Borrowers at closing, *see* Exhibit L, reflected a monthly payment amount of $4,642.76 and apparently did not include the $409.79 escrow payment. As a result, even though the Debtor sent the first payment in the instructed amount, she was immediately in default under this loan. Tribeca introduced a "Payment Letter to Borrower" and an Initial Escrow Account Disclosure Statement into evidence which were signed by the Borrowers on the closing date and which contained the correct monthly payment amount of $5,052.55. *See* Plaintiff's Exhibits 8 and 10.

[19] Exhibits P and Q consist of correspondence between Roache and the Commonwealth of Massachusetts Office of the Commissioner of Banks and the Attorney General's Office of the State of New York, respectively, and are not directly relevant to the discussion here.

Residential Loan Application, dated October 31, 2005, which contained two contradictory loan amounts of $385,000 and $420,000, a present market value for the Property of $650,000, a statement that the Property would be owned by the Borrowers as "Tenants in Entirety,"[20] and various questions to which the Borrowers answered "no" such as: "Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, [or] financial obligation. . . ;" (12) Exhibit T-2, a second Uniform Residential Loan Application, dated October 31, 2005, which contained the correct loan amount of $420,000 but which otherwise contained the same inaccuracies concerning the Borrowers' financial declarations and the form of tenancy as were contained in Exhibit T-1; (13) Exhibit T-3, a third Loan Application, dated December 22, 2005, which reflected that the Property would be owned by the Borrowers as joint tenants, but which also contained the same erroneous Borrower declarations and which provided a reduced appraised value of the Property of $550,000;[21] (14) Exhibit U, an "Itemization of Amount Financed" which was undated and unsigned by either of the Borrowers; (15) Exhibit V, a "Specific Closing Instructions" sheet, dated December 22, 2005, which reflected an incorrect initial payment amount of $4,642.76, and total closing fees and costs of $19,634.19;[22] (16) Exhibit W, a "Uniform Mortgage Loan

---

[20] In Massachusetts, a tenancy-by-the-entirety form of ownership is only available to persons who are married to each other. *See* Mass. Gen Laws ch. 184, § 7. The Debtor and Thomas, who are mother and son, would be ineligible to own the Property in this form of tenancy.

[21] This revised valuation was unsupported by a new appraisal.

[22] This amount is $2,653.36 less than the actual closing costs paid of $22,287.55.

Cost Worksheet," a worksheet for comparing closing costs among different mortgage

lenders, which was unsigned and undated, and which did not detail any of the more than

$22,000 of closing costs for the loan, but rather was presented in blank format to the

Borrowers at closing; (17) Exhibit X, a Massachusetts Borrower Interest Worksheet, dated

December 22, 2005, a form which is typically completed in refinancing transactions,

pursuant to Mass. Gen. Laws ch. 183, § 28C,[23] which was not executed by any of the

---

[23] That section provides in relevant part the following:

(a) A lender shall not knowingly make a home loan if the home loan pays
off all or part of an existing home loan that was consummated within the
prior 60 months or other debt of the borrower, unless the refinancing is in
the borrower's interest. The "borrower's interest" standard shall be
narrowly construed, and the burden is upon the lender to determine and
to demonstrate that the refinancing is in the borrower's interest.

Factors to be considered in determining if the refinancing is in the
borrower's interest include but are not limited to:--

(1) the borrower's new monthly payment is lower than the
total of all monthly obligations being financed, taking into
account the costs and fees;
(2) there is a change in the amortization period of the new
loan;
(3) the borrower receives cash in excess of the costs and fees
of refinancing;
(4) the borrower's note rate of interest is reduced;
(5) there is a change from an adjustable to a fixed rate loan,
taking into account costs and fees; or
(6) the refinancing is necessary to respond to a bona fide
personal need or an order of a court of competent
jurisdiction.

(b) Notwithstanding any provision to the contrary contained in this
chapter regarding costs and attorneys' fees, in any action instituted by a
borrower who alleges that the defendant violated subsection (a), the

22

parties;[24] (18) Exhibit Y, a Notice of Policy Expiration-Notice of Cancellation for Nonpayment of Premium, which reflected that the Debtor's homeowners' insurance policy would be cancelled effective July 25, 2006 for nonpayment; (19) Exhibit Z, a Federal Truth-in-Lending Disclosure Statement, signed and dated by the Borrowers on December 22, 2005; and (20) Exhibit AA, a Notice of Right to Cancel, signed and dated by the Borrowers on December 22, 2005, which provided the Borrowers with information about their statutory right to rescind the Note and Mortgage within three business days of closing.

Roache testified as an expert witness. She indicated that she had some experience as an attorney doing real estate closings and handling consumer credit matters. Additionally, she indicated that she consulted with a number of other experts in those fields in connection with her representation of the Borrowers in the State Court Action, including a broker and a real estate appraiser. She expressed the opinion that the loan documents provided by Tribeca evidenced a pattern of unfair and deceptive practices by Tribeca and its agents that financially damaged the Debtor and her son. Roache also testified that Tribeca and Elliott increased the amount of the loan from $385,000 to

---

> borrower shall not be entitled to costs and attorneys' fees if the presiding judge, in the judge's discretion, finds that, before the institution of the action by the borrower, the lender made a reasonable offer to cure and that offer was rejected by the borrower. . . .

Mass. Gen. Laws ch. 183, § 28C.

[24] As noted above, Roache testified at the trial that Tribeca was exempt from the requirements of this statute. Tr. at 175-76

$420,000 without disclosing the increase to the Borrowers and that the Borrowers only learned of the increased loan amount on the evening of the closing.[25] Tr. at p. 44-5. Moreover, when questioned by the Court about whether the broker was an agent of Tribeca, Roache responded: "The mortgage broker was the agent of Tribeca." Tr. at 176. Roache was not questioned about the basis of that conclusion, and the Debtor submitted no other testimony or evidence about Universal or Elliott's relationship with Tribeca.

When questioned about specific violations of RESPA, Roache referenced several exhibits, including Exhibit F, captioned "Credit Scoring Information," Exhibit R, the "Servicing Disclosure Statements," and Exhibit W, the "Uniform Mortgage Loan Cost Worksheet." She also asserted that "the application fees that were charged that were not supposed to be charged would be - - because they were not properly disclosed would have been a RESPA violation as well, and it's also because of the broker fee and the loan origination fee that Tribeca paid to themselves, because none of those had been disclosed previously." Tr. at 177.

Kelley testified that he had conducted nearly 500 real estate refinancing closings in 2005 and that he spent almost two hours at the Debtor's home on the evening of the closing. He indicated that the Borrowers were confused about the terms of the loan, testifying as follows:.

------

[25]According to the executed HUD-1 Settlement Statement, *see* Exhibit I, the liens on the Property, which were paid at closing, totaled $383,920.88, an amount just under $385,000, the amount the Debtor asserted that she intended to borrow. The balance of the $420,000 was paid toward closing costs of $22,287.55 and to the Borrowers in cash in the sum of $13,791.57.

> But really where the conversation became very specific was that they
> expected to get $25,000 back at closing, and I slowed everything down, and
> I asked them, you know, 'Are you aware that you're only getting [$13,000]?'
> . . . They were hoping for the [$25,000], because their game plan was to use
> the cash to service the debt for the twelve months in hopes of repairing
> credit and then getting out of that loan.

Tr. at 102-03.  Kelley also testified that other than the HUD-1 Settlement Statement and a

few other documents, he did not prepare the closing documents, Tr. at 106-07.  According

to Kelley, most of the closing documents were prepared by or on behalf of the lender and

then e-mailed to him for presentation to the Borrowers, including those which the Debtor

alleged contained forged signatures, Exhibits A and C through E, all of which were dated

prior to the December 22, 2005 closing.  Tr. at 141.  Kelley explained:

> I can only tell you one fact that I am aware of, and that's the day before the
> closing [December 21, 2005] Steve Elliott, the mortgage broker, went to [the
> Borrowers'] house.  I don't know what was done. [Exhibit A, the Statement
> of Borrower's Benefits] is dated that date.  That's all I can say.  The good-
> faith estimate I didn't do.

Tr. at 142.  Kelley further testified that, although he conducted hundreds of closings in the

past, he distinctly remembered the closing at the Debtor's home because the loan, in his

opinion, was a "sub, sub, sub, subprime [loan]."  Tr. at 124.   He added:

> They did ask- -- it -- a lot of the questions really zeroed in on - - I recognized
> that this payment was high, and we–I said, 'You've got to understand that
> this is a pretty high payment.  I hope you have a game plan' and
> they–[Mary Jane] and myself really worked through that.  And [the Debtor]
> didn't say a lot, to be honest with you, and [Thomas] was essentially not
> saying too much, but that was sort of what we whittled through was [how]
> high that payment was what their game plan was, so I – that was really the
> focus of the discussion.

Tr. at 123-24.  When questioned at trial about the Borrowers' "game plan" for making such

a high monthly payment, Kelley responded:

> [Thomas] had some health problems; I think it was cardiac-related. Felt he
> was getting better and that they were expecting a large contract from either
> the Post Office or UPS–the bailiwick of his business is essentially trucking
> for the – either the U.S. Postal or UPS. It was in February or March they
> were expecting a rather large contract, and that was going to help them
> defray some of the expenses. . .

Tr. at 125.

Kelley also testified, in response to a question from the Court, about the
relationship between the broker and the lender. He stated: "I don't think they have any,
Judge, other than a pure business relationship." Tr. at 136. He added: "I would say [a]
very superficial [business relationship]," providing the following explanation:

> I think that how it works is the brokers get rate sheets from various
> representatives, wholesale representatives, and they try to develop
> relationships with them, and they go usually with the best deal they can
> find for the client that they're looking for to place loans with. I don't think
> other than the wholesale rep that broker would have a lot of contact with
> the particular lender or the staff of the lender.

Tr. at 136.

The Debtor testified that she did not execute Exhibits A and C through E and that
the signatures appearing on those documents were forged, that she was not permitted to
review the loan documents at closing or ask questions about them prior to signing them.
According to the Debtor, she was repeatedly instructed by the closing attorney to "Keep
signing. Keep signing." Tr. at 182, 186. Later, when cross-examined, the Debtor's
testimony and demeanor changed and she exhibited clear signs of confusion and
disorientation about her financial difficulties:

| | |
|---|---|
| Question: | . . . And did - - you saw Mr. Kelley, the attorney testifying today? |
| Answer: | I wouldn't know Mr. Kelley. |
| Question: | Okay. Do you say he didn't come to your house at all? |
| Answer: | No. |
| Question: | I'm sorry.  No, he didn't come or no, he wasn't –no, he wasn't the one? |
| Answer: | No, he didn't come to my house. |

****

| | |
|---|---|
| Question: | After your husband died you had some financial difficulty |
| Answer: | No. |
| Question: | No? |
| Answer: | No. |
| Question: | Things were going okay? |
| Answer: | Yeah. |

*See* Tr. at 190-91.    Thereafter, the Debtor was unable to continue with her testimony.

### III. POSITIONS OF THE PARTIES

A. <u>The Debtor</u>

The Debtor argues that Tribeca and its agents committed unfair and deceptive practices in connection with the refinancing in violation of Mass. Gen. Laws ch. 93A, RESPA and common law theories of recovery by intentionally inflating the value of her Property to increase the loan to value ratio of the credit; changing and falsifying portions of her loan application without her knowledge or consent for the purpose of qualifying her for a higher loan with higher closing costs; withhold ing documents from her throughout the refinancing process to conceal the loan's high closing costs; and forging the Borrowers' signatures on certain documents to facilitate the transaction. Specifically, the Debtor alleges that she was the target of a predatory lending scheme by Tribeca and its agents in 2005, when she was in the midst of an impending foreclosure sale and facing

27

severe financial hardship, and that Tribeca took advantage of her personal and financial

crisis by selling her a mortgage loan she could not afford to pay and which was in an

amount greater than necessary to avoid foreclosure by Wells Fargo.[26] Further, she asserts

that Tribeca maximized the principal amount of the loan and the closing costs by inflating

the appraisal of the Property and by requiring her to borrow additional funds to pay the

tax liens, the amount of which she was independently trying to negotiate and reduce

outside of the closing with the assistance of Attorney Burke. The Debtor claims that she

intended to borrow only  $385,000.  *See* Exhibit T-1, a Residential Loan Application

executed by the Borrowers on October 31, 2005 which lists the loan amount at $385,000.

The Debtor also asserts that the mortgage loan was procured through fraud.  She

claims that she and Thomas completed an original loan application in their own

handwriting and that the form was later changed to omit information about the tax liens

and Wells Fargo's pending foreclosure.  In her view, the loan would never have been

approved had this information been properly represented in the applications.

Additionally, according to Roache, the loan applications contained erroneous information

concerning the Debtor's marital status and tax debts which the Debtor would not have

verified had she been given the opportunity to review the documents at closing.  *See*

---

[26] In her post-trial brief, the Debtor asserted that the monthly mortgage payment
to Tribeca after the refinancing was $5,052.55, a figure almost 33% higher than the
amount she was paying on her prior mortgage which was in foreclosure.  *See also*
Exhibit C, the Resource Letter the Debtor alleged to be forged, which provided that: "If
your annual income is projected to be lower than $138,750, you must have additional
resources available to fund your monthly payments. . ."

Exhibits T-1 through T-3.

The Debtor also alleges that Elliott and Universal, as agents of Tribeca, misrepresented or concealed the high closing costs they charged for the loan in violation of Mass. Gen. Laws ch. 93A. She points to the Mortgage Broker Disclosure, dated October 30, 2005, *see* Exhibit J, prepared by Elliott on Universal letterhead which reflects that the maximum mortgage broker fee to be charged was either $8,400 or zero,[27] while she and Thomas actually paid $12,600 as a broker fee at the closing. Further, the Debtor maintains that she and Thomas never agreed to the broker and loan origination fees prior to closing and that the fees were not timely disclosed.[28] Finally, she emphasizes the existence of forged documents containing blatant factual errors regarding the location of the Property, the purpose of the loan and the name of the Debtor's deceased husband.

B. <u>Tribeca</u>

Tribeca contends that the Debtor failed to show by a preponderance of credible evidence that she has a reasonable likelihood of success on the merits in her State Court Action. It maintains that Debtor has no viable claims under RESPA or TILA, that she has failed to show that she has sustained damages as a result of any alleged violations of RESPA or TILA by Tribeca, and that Tribeca is not vicariously liable for the acts or

---

[27] This $8,400 figure appears to stricken with a handwritten slashed zero ("∅") at the top of the document.

[28] Despite the fact that these fees did appear on the Good Faith Estimate dated the day before the closing, *see* Exhibit B, the Debtor asserts that they should have been disclosed to the Borrowers earlier in the transaction.

misdeeds of Elliott or Universal. Additionally, it asserts that the Debtor did not present

sufficient evidence at trial to establish that some of the pre-closing documents were

forged. In sum, Tribeca asserts that it has demonstrated a "colorable claim to property of

the estate" under Grella v. Salem Five Cent Sav. Bank, 42 F. 3d 26, 33 (1st Cir. 1994).

## IV. DISCUSSION

In Grella, the United States Court of Appeals for the First Circuit stated:

> In a relief from stay hearing, the only issue properly before the court, and
> thus the only one actually adjudicated, is whether the stay should be lifted
> because a creditor has shown a colorable claim. Put another way, and
> employing the preliminary injunction analogy discussed above, a creditor
> must show a reasonable likelihood that it has a meritorious claim, and the
> court may consider any defenses or counterclaims that bear on whether this
> reasonable likelihood exists. If the stay is lifted, however, what has been
> actually adjudicated is only that the creditor has shown this reasonable
> likelihood. It is not a ruling on the merits of the underlying claim.

42 F.3d at 34. Although this Court cannot adjudicate the Borrowers' claims against

Tribeca or other third parties that are the subject of the State Court Action, the Court may

consider and evaluate them as defenses and counterclaims in the context of the Motion for

Relief. The Court afforded the Debtor an opportunity to establish the likelihood of success

on the merits of her claims and those of her co-borrower, Thomas. As Tribeca recognized,

the Court granted the Debtor an opportunity to submit sufficient evidence to justify the

issuance of an injunction against the continuation of Tribeca's foreclosure proceedings

pending a determination of the merits of the State Court Action.[29]

---

[29] In determining whether preliminary injunctive relief is appropriate, the United
States Court of Appeals for the First Circuit has directed trial courts to consider: 1) the
likelihood of success on the merits; 2) the potential for irreparable harm if the injunction

Upon consideration of the documentary and testimonial evidence introduced at trial and the entire record of proceedings in this matter, the Court finds that the defenses and counterclaims asserted by the Debtor may present serious questions about the conduct of Elliott and Universal and their relationship, if any, with Tribeca, as well as the propriety of the loan transaction. The evidence presented, at this point in time, however, did not establish the Debtor's likelihood of success on the merits. The Debtor failed to submit evidence of substantial damages in excess of the amounts due Tribeca or a likelihood that she could rescind the refinancing transaction or obtain a determination that the Note and Mortgage are unenforceable. Although it is undisputed that the Debtor executed the Note and Mortgage, she failed to provided sufficient evidence, at this stage, to establish that the Borrowers' execution and delivery of documents were induced by fraud on the part of Tribeca. The shortfall in the Debtor's proof relates to the complete absence of compelling evidence that Elliott or Universal were agents of Tribeca. Although Roache testified in a conclusory fashion that the broker was Tribeca's agent, her testimony lacked foundation and was called into question by Kelley's testimony. In the absence of other compelling evidence, Roache's testimony is entitled to little weight, particularly because she did not state how she arrived at her conclusion. Additionally, Roache only testified on this matter during her examination by the Court; she was not asked about any

---

is denied; 3) the balance of relevant impositions, *i.e.,* the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and 4) the effect, if any, of the court's ruling on the public interest. *See* Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir.1996) (citations omitted).

agency relationship between the broker and Tribeca during her direct examination by the

counsel to the Debtor. Despite the allegations that documents were forged in order to

close the loan, the Debtor did not tie misconduct on the part of Elliott or Universal to

Tribeca with reference to an agency relationship or a yield spread premium.

The evidence convincingly supports the conclusion that the Borrowers were

presented with an abundance of contradictory and sometimes blatantly false information

in the documents underlying the loan approval process. The Debtor produced records

and testimony demonstrating conflicting or inaccurate information about the total amount

to be borrowed, the appraised value of the Property, the ownership and location of the

Property, the amount of the regular monthly payment, the cash out, the broker's fee, liens

to be paid at closing, the status of the Borrowers' financial affairs, and even the familial

relationship between the Debtor and Thomas. *See* Exhibits H, I, J, K, L, R, T-1 through T-3,

and V, Tribeca's Exhibits 8 and 10, and Tr. at 45, and 102-03. The Borrowers were

confused at the closing about the loan terms, such as the amount they were borrowing,

and the amount they would receive as a cash out. The issue related to the amount of the

cash out was of acute importance because it represented a source from which the

Borrowers were going to service the debt. In fact, the Borrowers only made as many

payments as the reduced cash out amount would permit. When questions arose at the

closing, Kelley, who was indisputably the agent of Tribeca, consulted with Mary Jane, not

the Debtor who testified that she was not given an opportunity to ask questions at the

closing. *See* Tr. at 123-24 and 182. Even though Kelley's office did not produce many of

32

the disputed documents, he was well aware about the "sub, sub, sub prime" nature of this loan, and he testified that the two people who were responsible for its payment, the Debtor and Thomas, remained mostly silent during the closing. Although an attorney with his experience perhaps should have determined that the Borrowers lacked an understanding of the terms of this loan, the Borrowers did not allege in their complaint or in the pleadings filed in this Court that the Debtor lacked the capacity because of her age or mental state to enter into the loan transaction with Tribeca. The conflicting information may have compromised the Borrowers' ability to evaluate the transaction and to find other solutions for their predicament, however difficult or remote such a solution may have been. Nevertheless, the compilation of these mistakes does not currently support viable ch. 93A or RESPA claims against Tribeca. Moreover, the Borrowers do not dispute that they signed the Standard Form Residential Loan Application which contained false information.

The Debtor's allegations of forgery, which the Court finds plausible at least with respect to Exhibits D and E in light of the dates appearing on those documents (November 5, 2005) and the factual errors contained in them, support a finding that Elliott and Universal may have engaged in deceptive conduct to obtain approval of a loan with Tribeca. The Debtor did not call Elliott as a witness, and other than Roache's conclusory opinion, which was called into doubt by Kelley, there was no evidence concerning Elliott's relationship to Tribeca. Absent credible evidence that could support Roache's conclusory statement that the broker was Tribeca's agent, this Court cannot find that Tribeca is

vicariously liable for fraud on the part of Elliott and Universal. Of course, the Borrowers, after a full and fair opportunity for discovery, may obtain that evidence in the State Court Action.

The Debtor failed to reference specific provisions of TILA or RESPA on which her claims under Mass. Gen. Laws ch. 93A rest, although she did cite to the Attorney General's regulations pertaining to Mortgage Broker and Mortgage Lenders, *see* 940 Mass. Code Regs. 8.01, *et seq.*, which are intended to "ensure that the mortgage industry is operating fairly and honestly by means of legitimate and responsible business acts and practices that are neither unfair nor deceptive." Id. at 8.01. It is an unfair or deceptive act or practice to fail to disclose "any fact relating to the loan transaction, disclosure of which may have influenced the borrower not to enter into the transaction with the broker or lender." Id. at 8.05(7). Similarly, it is an unfair or deceptive practice for a mortgage lender to fail to give the borrower legible copies of the mortgage deed, promissory note and the Settlement Statement when completed or at the time of closing. Id. at 8.05(4). The regulations, as they were in effect on the closing date, also defined prohibited practices, which include making false or misleading representations or statements regarding charges incident to the transaction,[30] charging application or brokerage fees which significantly

---

[30] The Code of Massachusetts Regulations provided:

(1) It is an unfair or deceptive act or practice for a mortgage broker or lender to make any representation or statement of fact if the representation or statement is false or misleading or has the tendency or capacity to be misleading, or if the mortgage broker or lender does not have sufficient information upon which a reasonable belief in the truth of

deviate from industry standards or are otherwise unconscionable,[31] failing to give a

borrower the time and reasonable opportunity to review required closing documents,[32]

---

the representation or statement could be based. Such claims or
representations include, but are not limited to the availability, terms,
conditions, or charges, incident to the mortgage transaction and the
possibility of refinancing. In addition, other such claims and
representations by the broker may include the amount of the brokerage
fee, the services which will be provided or performed for the brokerage
fee, the borrower's right to cancel any agreement with the mortgage
broker, the borrower's right to a refund of the brokerage fee, and the
identity of the mortgage lender that will provide the mortgage loan or
commitment.

940 Mass. Code Regs. 8.06(1).

[31] The Code of Massachusetts Regulations provided:

(2) It is an unfair or deceptive act or practice for a broker or lender to
charge an application and/or brokerage fee which significantly deviates
from industry-wide standards or is otherwise unconscionable.

940 Mass. Code Regs. 8.06(2). The Debtor introduced no evidence of what industry-
wide application and brokers' fees were in 2005, thus making it impossible for this
Court to determine if the fees charged to the Debtor deviated from them and were
unconscionable.

[32] The Code of Massachusetts Regulations further provided:

(11) It is an unfair or deceptive act or practice for a mortgage broker or
lender to fail to give to the borrower or his or her attorney the time and
reasonable opportunity to review every document signed by the borrower
and every document which is required pursuant to these regulations, and
other applicable laws, rules or regulations, prior to the disbursement of
the mortgage funds.

940 Mass. Code Regs. 8.06(11). The Debtor's testimony was at odds with Kelley's who

and accepting fees which were not disclosed in accordance with regulations and applicable law.[33]

While the Debtor may eventually establish viable ch. 93A claims against some parties in the State Court Action, her supposed RESPA claims are far more speculative. Roache testified that Exhibit R violated RESPA. That exhibit contained two Servicing Disclosure Statements required by 12 U.S.C. § 2605. The first statement, which was unsigned by the Borrowers, disclosed that Tribeca had previously assigned, sold, or transferred the servicing of first lien mortgage loans, and it set forth the percentage of loans transferred in 2002 (75%), 2003 (75%), and 2004 (50%). The first disclosure did not include assignments, sales, or transfers to affiliates or subsidiaries. The second statement, which the Borrowers signed, indicated that 100% of the loans for 2002, 2003 and 2004 were assigned, sold or transferred, but this statement included assignments, sales or transfer to affiliates or subsidiaries. Roache highlighted the disparity in the disclosure statements,

---

testified that he discussed loan terms with the Borrowers or at least Mary Jane.

[33] The Code of Massachusetts Regulations provided:

> (12) It is an unfair or deceptive act or practice for a mortgage broker or lender to accept any fees which were not disclosed in accordance with these regulations or applicable law.

940 Mass. Code Regs. 8.06(12). All fees were disclosed on the final HUD-1 Settlement Statement, Exhibit I, which was signed by the Borrowers. The Court notes the curious existence of the Resource Letter, *see* Exhibit C, relating to the "no income, no asset" loan program, alleged by the Debtor to be forged. *See* 940 Mass. Code Regs. 8.06(16) (it is an unfair or deceptive practice for a mortgage broker or lender to process or make a "no documentation" loan without appropriate written disclosure to the borrower). This regulation was not effective until November 15, 2007.

but in view of the distinction on the face of the form as to whether transfers to affiliates and subsidiaries were included, the Court is unable to conclude that Tribeca violated any provisions of RESPA.

Roache also testified that Exhibits F and W violated RESPA. Exhibit F, which was not completed and was not signed by the Debtor, pertained to the disclosure of the Debtor's credit score. The form itself references the FDCPA, and the Court cannot determine how this document, which the Debtor may never have seen, could have damaged her. Similarly, with respect to Exhibit W, the incomplete and unsigned Uniform Mortgage Loan Cost Worksheet, there was no evidence the Debtor was required to receive the document or was damaged in any way by receiving it, if in fact she did. The Debtor did not cite the provision of RESPA violated by receipt or non-receipt of the document.

Although Roache testified that the Debtor did not receive timely disclosure of the broker and loan origination fees in the Good Faith Estimate (Exhibit B) she received the day before the closing, the Debtor did not dispute that she signed that document before the closing. While imperfect, the Good Faith Estimate contained reasonable estimates of the settlement charges although it did not appear to have been delivered to the Debtor in accordance with the provisions of Regulation X, 24 C.F.R. § 3500.7, which implements the provisions of RESPA -- a regulation to which the Debtor did not refer. Because the Debtor appears not to have received the Good Faith Estimate within the time set forth in Regulation X, either the broker or lender may be liable for a RESPA violation. The Court notes, however, that the requirement of a good faith estimate of settlement costs is set

37

forth in 12 U.S.C. § 2604(c), which contains the requirements for the special information

booklets for persons borrowing money to purchase residential real estate, as opposed to

those persons borrowing money to refinance existing obligations. In addition, section

2604(c) does not set forth a private right of action for borrowers. *See* Collins v. FMHA-

USDA, 105 F.3d 1366, 1368 (11th Cir. 1997), *cert. denied,* 521 U.S. 1127 (1997); Brophy v.

Chase Manhattan Mortg. Co., 947 F.Supp. 879, 833 (E.D. Pa. 1996); Balko v. Carnegie Fin.

Group, Inc. (In re Balko), 348 B.R. 684, 693 n.12 (Bankr. W.D. Pa. 2006).   Moreover,

contrary to Roache's opinion, under Hershenow v. Enterprise Rent-A-Car, 445 Mass. 790,

840, 840 N.E.2d 526 N.Ed2d 526 (2006), a mere technical violation, without more, does not

support a claim under Chapter 93A.  *See also* Nosek v. Ameriquest Mortgage Co. (In re

Nosek), No. 04-4517, 2006 WL 2700792 (Bankr. D. Mass. September 19, 2006).  The Debtor

failed to assert, let alone, establish a causal connection between the failure to provide her

with a timely Good Faith Estimate and her loss.

Roache did not testify that the broker fee charged by Universal deviated from

industry wide standards. Absent information about customary brokers' fees for borrowers

with poor credit histories, the Court cannot determine whether the fee was

unconscionable or illegal, and, without evidence of the relationship between Universal

and Elliott, on the one hand, and Tribeca, on the other, the Court cannot find that the

Debtor is likely to succeed on the merits of her ch. 93A claim against Tribeca on that basis.

*See* Sullivan v. Decision One Mortgage (In re Sullivan), 346 B.R. 4 (Bankr. D. Mass. 2006).

In Sullivan, this Court rejected a debtor's *assumption* that a lender was liable for the alleged

38

wrongdoing on the part of various mortgage brokers. Id. at 26. Like the debtor in
Sullivan, Roache did not support her conclusory statement with a scintilla of evidence.

Based on the Debtor's testimony, and the Court's observation of her demeanor,
there is a real question as to whether she had the mental capacity to enter into the loan
transaction. Although she clearly recalled that a closing occurred and that she signed
many documents on the evening of December 22, 2005, she appeared not to remember, or
to be completely unaware, that she had experienced financial problems following Edwin's
death which led to the need to refinance the Property to avoid foreclosure. Given her age,
80 years old in 2005, her lack of financial sophistication,[34] the economic pressures created
by Thomas's medical problems, and the financial predicament she faced, the State Court
possibly could find that she was the target of a predatory lending scheme by Tribeca and
others. *See generally*, United Companies Lending Corp. v. Sargeant, 20 F. Supp. 2d 192 (D.
Mass. 1998).[35] The Debtor, however, did not allege a lack of capacity in her State Court

---

[34] The Court finds inferential support for this in the Debtor's repeated reliance on
Mary Jane, her daughter, to meet with Elliott, to oversee the loan process and to engage
counsel to assist her. *See* Tr. at 18, 124, 171, 189-90.

[35] In Sargeant, the court stated:

The targets of predatory lenders are usually people who have substantial
equity in their homes due to rising real estate values or due to the
reduction of purchase money debt, but who are short on cash because of
their low or fixed incomes. They may need money to make home repairs
or improvements, to pay for necessities such as medical care, or to
consolidate household debts. These homeowners generally do not obtain
home equity loans primarily for their tax advantages but because
borrowing against their homes is the only way that they can obtain the
credit they need to make home repairs or to survive periods of economic

39

Action or at the evidentiary hearing held in this Court. Although she may have been confused as to the term and conditions of the loan, her son and daughter were present at the closing to assist and presumably advise her. There was no evidence that Mary Jane, who procured the broker and was present at the closing, was unsophisticated or misled by the transaction.

The evidence submitted by the Debtor to obtain injunctive relief was insufficient to satisfy her burden. That is not to say that the Debtor cannot prevail in her State Court Action. The Court finds, however, that all too often counsel rely upon the tragedy of a situation to circumvent the diligence required to actually prove, or in this case demonstrate a reasonable likelihood of proving, violations of the myriad federal and state consumer protection statutes whose remedies do not necessarily overlap or afford much relief to debtors unable to rescind and tender under TILA, unable to obtain a determination of unenforceability under the Massachusetts Predatory Home Loan Practices Act, Mass. Gen. Laws ch. 183C, § 3, or unable to make out clear violations of specific statutory provisions as was the case in In re Maxwell, 281 B.R. 101 (Bankr. D. Mass. 2002).

The Debtor in this case was facing a foreclosure proceeding. Tax liens encumbered

------------------------------------------------------

distress. Those most often affected are minorities, the elderly, and the inner-city and rural poor.

Id. at 202. See also Maxwell v. Maxwell (In re Maxwell), 281 B.R. 101 (Bankr. D. Mass. 2002).

her property.  Her business, if it were ever successful, was not generating sufficient income to satisfy its tax obligations and provide the Debtor and Thomas with sufficient income to satisfy existing mortgage debt and their day to day needs.  Given the Debtor's age and indisputably poor credit history, she was not a candidate for a conventional, thirty-year, fixed-rate mortgage loan.  While she may have been misled about the amount of the loan and the cash she was going to receive at the closing, she did not provide any evidence to impute misconduct on the part of the mortgage broker to Tribeca.  This Court cannot find that the Debtor has a likelihood of success on the merits of her claims against Tribeca, particularly as her transaction with it averted a foreclosure sale by Wells Fargo.  Although the Debtor may have been the victim of misconduct on the part of the broker - - perhaps a "bait and switch" as to the amount of the loan and the amount of the cash out, or the promise of a refinancing in the future, she did not succeed at this juncture in pointing to specific misconduct on the part of Tribeca that would forestall its entitlement to relief from stay in the summary proceeding mandated by the court in <u>Grella</u>.

## V. CONCLUSION

In accordance with the foregoing, the Court shall enter an order granting Tribeca's Motion for Relief.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: February 19,  2008

41